<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| WEST WINDSOR-PLAINSBORO REGIONAL SCHOOL DISTRICT BOARD OF EDUCATION | Hon. Stanley R. Chesler, U.S.D.J. |
| Plaintiff/Counterdefendant, | |
| v. | Civ. No. 04-3459 (SRC) |
| J.S. and M.S. o/b/o M.S. | **OPINION** |
| Defendants/Counterclaimants. | |

---

<u>**CHESLER, District Judge**</u>

**THIS MATTER** comes before the Court on cross-motions by Plaintiff and Defendant for

Summary Judgment (docket items # 13 and 14).  The Court having considered the papers

submitted by the parties, and for good cause shown, **GRANTS** Plaintiff's Motion (docket item

#13) and **DENIES** Defendant's Cross-Motion (docket item # 14) for the reasons set forth below.

**I. BACKGROUND**

This Individuals with Disabilities Education Act ("IDEA") case concerns the school

placement for Defendant M.S. during the 2002-2003 academic year.[1]  The case was originally

---

[1] By prior stipulation of the parties in the proceedings before the Administrative Law Judge ("ALJ"), whatever judgment is entered or relief ordered for the 2002-03 school year also likewise applies to the 2003-04 school year.  (See A.R. 32.)

brought on M.S.'s behalf by her parents, Dr. and Mrs. S.  At issue is the Plaintiff West Windsor-Plainsboro Regional School District Board of Education's (the "District") refusal to pay for M.S.'s parents' unilateral placement of their daughter at the Family Foundation School, a placement that was contrary to the recommendations of the Individual Education Program ("IEP") that the District prepared for M.S. for the 2002-2003 school year.  M.S.'s parents prevailed in the due process hearing before the Administrative Law Judge ("ALJ"), wherein ALJ Steven Reback held that the "decision to unilaterally place [M.S.] at a residential therapeutic out-of-district placement provides her with the most appropriate placement available and will confer upon her the opportunity both educationally as well as emotionally to grow, nurture, become more responsible, to develop self-esteem which would then provide her with the opportunity to receive a meaningful educational experience."[2]  (A.R. at 74.)  He ordered that the District's determination recommending out-of-district day placement for M.S. be reversed, and that the District reimburse M.S.'s parents for tuition, room, and board at the Family Foundation School as well as reasonable costs and counsel fees incurred by M.S.'s parents in pursuing the suit. (A.R. at 74.)  Subsequently, the District filed a complaint in this Court on or about July 22, 2004, challenging the ALJ's findings and decision.

---

[2] The Administrative Record was made during the due process hearing which was conducted during the 2003-04 school year.  All factual references in this Opinion are to that Record, unless otherwise noted.  The Administrative Record will be cited as ("A.R.").  There are 12 volumes of hearing transcripts and exhibits in this case, totaling over 1,400 pages.  For reference purposes in this Opinion, the transcripts are cited by volume number rather than by date, for example, ("Tr. 11 at 111-12.")  The briefs of the parties on the pending cross-motions for judgment in this court are cited as defendant's brief ("Def.'s Br."), plaintiff's brief ("Pl.'s Br."), plaintiff's response brief ("Pl. Repl. Br."), and defendant's response brief ("Def.'s Resp. Br.").

**A.      Individuals With Disabilities Education Act, 20 U.S.C. 1400 <u>et</u> <u>seq.</u>**

The Individuals with Disabilities Education Act ("IDEA") is the vehicle created by Congress to ensure states follow a mandate to provide a "free and appropriate education" ("FAPE") to all disabled children.  20 U.S.C. §1412.  "Educational instruction specially designed to meet the unique needs of the handicapped child," coupled with services "necessary to permit the child to 'benefit' from the instruction" constitute a FAPE.  <u>Susan N. v. Wilson Sch. Dist.</u>, 70 F.3d 751, 756 (3d Cir. 1995).

For each child identified as eligible for special education, a written statement called an Individual Education Program ("IEP") is developed.  The IEP, which addresses and includes several elements as provided under 20 U.S.C. §1414(d)(1)(A), is designed to ensure implementation of a FAPE for the child.  <u>S.H. v. State-Operated Sch. Dist. of Newark</u>, 336 F.3d 260, 264 (3d Cir. 2003).  In addition to defining the content required, IDEA provides that an IEP should be developed considering the strengths of the child, concerns of the parents, and recent evaluations of the child.  <u>Id.</u>  The team responsible for developing the IEP consists of the child's parent(s), at least one of the child's special education teachers, a curriculum specialist and, if the parent or school board requests, a person with special knowledge or expertise related to the child's education.  <u>Id.; see also</u> 20 U.S.C. §1414(d)(1)(B).  IDEA further mandates that the team review the IEP annually "to determine whether the annual goals for the child are being achieved." 20 U.S.C. §1414(d)(4).

Under IDEA, as well as the New Jersey regulations adopted to implement it, there exists a

strong preference for mainstreaming, in other words, requiring education in the least restrictive environment.  20 U.S.C. § 1412(a)(5)(A).  The Third Circuit has interpreted this requirement to mean "mandating education 'in the least restrictive environment that will provide [the student] with a meaningful educational benefit.'"  S.H., 336 F.3d at 265 (quoting T.R. v. Kingwood Twp. Bd. Educ., 205 F.3d 572, 578 (3d Cir. 2000)).  "The least restrictive environment is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled."  Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995).

IDEA does not require that a school district maximize a student's potential or provide the best possible education.  Rather, the statutory obligation is satisfied "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  Bd. of Educ. v. Rowley, 458 U.S. 176, 203 (1982).  The IEP must provide "meaningful" access to education, id. at 192, and confer "some educational benefit" upon the child.  Id. at 200.  In order to be appropriate, however, this educational benefit must be more than "trivial."  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999).  An appropriate IEP is "gauged in relation to the child's potential," id., and must offer the potential for "significant learning" and "meaningful benefit."  Id.

When a parent believes the district has not provided their child with a FAPE as required under IDEA, he or she may object to the IEP and request a due process hearing or a mediation conference.  See Lascari v. Bd. of Educ., 116 N.J. 30, 36 (1989) (citing applicable New Jersey state regulations).  The parent(s) need only place the appropriateness of the IEP at issue, shifting

4

the burden to the school district to prove that the IEP was indeed appropriate.  However, the focus of this inquiry is on "the IEP actually offered and not one that the school board could have provided if it had been so inclined."  Id. at 46.

In a situation where a child has been unilaterally placed by his or her parents in an educational setting contrary to the IEP, they may still be entitled to reimbursement, but only if the school district "fails to meet its burden of establishing the appropriateness of its program and if the parents demonstrate they have acted in good faith."  Id.; see also 20 U.S.C. § 1412(a)(10)(C)(ii).  In essence, if the school district fails to show that it offered the student a FAPE, the burden shifts back to the parents to establish that they unilaterally placed their child in an appropriate program.  Once an ALJ issues a final order following a due process hearing, the aggrieved party may appeal that decision to a state court of competent jurisdiction or the federal district court.  20 U.S.C. § 1415(c)(2).

**B.      Current Dispute**

The current dispute arises from M.S.' school placement for the 2002-2003 school year.  At issue is M.S.'s unilateral placement at the Family Foundation School, an out-of-state residential institution.  This placement was inconsistent with the IEP the District prepared for M.S., which designated a choice of out-of-district day placements.  It is important to note that, unlike many IDEA placement cases, cost to the District was not the underlying issue here.  According to the testimony on the record, tuition for the Family Foundation School, inclusive of room and board, was "around $42 or $45,000."  (Tr. 4 at 19.)  Costs that would have been

5

assumed by the District for the placements proposed in their IEP ranged from "between $40 and $50,000" per year, not including the additional costs to transport M.S. to the out-of-district placements.  (Id.)  According to the District's undisputed testimony, "the programs that [the District] w[as] recommending would be more costly to the [D]istrict" underscoring the fact that the District's decision to recommend a day placement rather than a residential placement for M.S. was not financially-driven.

Following are the relevant undisputed facts.  M.S. was born on May 21, 1986.  (A.R. at 35.)  M.S.'s father, Dr. S., is a former interim superintendent of East Windsor Regional School District who currently provides educational consulting to various school districts in the state of New Jersey.  (Tr. 11 at 49-50.)  Her mother, Mrs. S., is employed as a hospice nurse.  (Tr. 9 at 77.)  M.S. attended school in the West Windsor/Plainsboro public school system from kindergarten through ninth grade.  (A.R. at 111.)  During this time, she was described by her father as "a student who usually did well academically."  (Id.)  During the 1999-2000 school year, M.S. attended high school at West Windsor/Plainsboro North High School ("WWPNHS").  (A.R. at 93.)   During this year, M.S. began to have behavioral problems at home.  M.S. often argued with her parents, dressed in a manner described by her parents as "provocative," wore heavy makeup, and "ma[de] friends with peers with whom her parents were not acquainted."  (A.R. at 37.)

One night, at the beginning of ninth grade, M.S. went out, claiming she was going to a friend's house to work on a school project.  (Tr. 9 at 104-05.)  Later that evening, M.S.'s parents received a call from the parents of the child whose house M.S. was at, asking them to come pick

up their daughter who was in an apparently drunken condition.  (<u>Id.</u> at 105.)  After retrieving

their daughter, the parents took her to the University Medical Center at Princeton where they

performed a blood alcohol test and a toxic screen for narcotics.  (<u>Id.</u>)  The tests came back

positive for alcohol, but negative for other drugs.  (A.R. at 37.)

     While at the hospital and still intoxicated, M.S. confessed to her parents that she had

previously held a party at their house where alcohol was served.  (Tr. 9 at 106.)  At this time, she

also asked her parents if there were bruises on her legs.  (<u>Id.</u>)  When her parents inquired further,

M.S. said "I think somebody hurt me at the party."  (<u>Id.</u>)  M.S. refused to accompany her parents

to a rape crisis center, but her parents did subsequently enter M.S. into an alcohol counseling

program.  (<u>Id.</u> at 106-07.)

     During the rest of the year while M.S. was attending WWPNHS, her parents noted that

she was trying to avoid going to school by claiming she was sick and either couldn't go to school

or had to come home early.  (<u>Id.</u> at 111-13.)  According to WWPNHS records, by the end of

ninth grade, M.S. had missed a total of twelve entire days of school.[3]  (A.R. at 194.)  During this

time, her parents also reported that she frequently engaged in "intense arguments" with them.

(<u>Id.</u> at 108.)

     On May 31, 2001, towards the end of M.S.' ninth grade year, she went out to a friend's

house, claiming she was working on a school project.  (Tr. 9 at 114.)  M.S. was found later that

evening in a car that was pulled over by the police for drunk driving.  (<u>Id.</u> at 114-115)  When the

---

[3] M.S.'s attendance records for this school year indicate that she also missed some individual class periods as well as was late for certain classes during the year.  (A.R. at 194.)

car was stopped, the officers also noted that M.S., who was not the driver, was nonetheless intoxicated and engaged in some form of sexual activity.  (Id.)  M.S.'s parents later learned that their daughter went out that night with a group of friends who had broken into the West Windsor community pool and held a party where alcohol was being served.  (Id.)  The next day, M.S. went to see a school counselor for fear that she may be pregnant.  (Id. at 116.)  Her parents also heard that M.S.'s friends had told the school counselor that their daughter may have been raped at the party.  (Id.)  When they confronted M.S., however, she denied having sex at the party and refused to submit to any physical examination or a rape kit.  (Id.)

After this incident, Dr. and Mrs. S. met with a child study team from the District to discuss their daughter's problems.  (Id.)  The child study team recommended that M.S.'s parents stage an 'intervention' with M.S. and enter her into an alcohol rehabilitation program.  (Id.)  The parents, with the assistance and participation of a substance abuse counselor from the District and the assistant principal from WWPNHS, staged an intervention with M.S.  (Id. at 119-20.)  M.S. subsequently attended a twenty eight day program at the Caron Foundation for alcoholism.  (Id. at 120.)

While M.S. was at the Caron Foundation, Mrs. S. was going through M.S.'s room and discovered a series of letters that her daughter had written to friends.  (Id. at 118.)  These letters indicated that M.S.'s drinking and sexual behavior were not isolated incidents, but had been occurring regularly throughout the past year.  (Id.)  Despite these problems, M.S. successfully

completed ninth grade at WWPNHS with a weighted GPA of a 3.68.[4]

After M.S. returned from the Caron Foundation, her parents enrolled her in Alcoholics Anonymous and an outpatient treatment program at Princeton House. (Id. at 123-24.) During her treatment at Princeton House, she was diagnosed with depression and social anxiety. (Id.) The resident psychiatrist at Princeton House started treating M.S. with a prescription for Paxil. (Id.)

Dr. and Mrs. S. also decided they needed to change "people, places and things" for M.S., including enrolling her in a new school. (Id. at 121) For the tenth grade (the 2001-2002 school year), M.S. was enrolled at Notre Dame High School ("NDHS"), a local Catholic school. (Id. at 124.) During this year, M.S.'s parents report that their daughter was unhappy about having to change schools and make new friends. (Id.) They also recall that she was reluctant to get up to go to school, and difficult to get moving in the morning. (Id. at 127.) She resisted the uniform requirements of her new school, and was disciplined by the school for rolling up her skirt to make it shorter, and failing to tuck in her uniform blouse. (Id.)

During M.S.'s year at NDHS, her parents noted an incident where M.S. was driven to to the school by her mother, but refused to get out of the car. (Id. at 128.) Upon arriving at school, M.S. noticed that it was "dress down" day, and she was wearing her school uniform. (Id.) M.S. insisted that her mother drive her home so she could change into 'street clothes,' and when she refused, M.S. refused to get out of the car. (Id.) This standoff continued for some time, and

---

[4] M.S.'s grades for this year included 3 "Bs," 4 "As," and one "C" in Honors Geometry. (A.R. at 93.)

9

when Mrs. S. tried to drive back to school rather than take her daughter home, M.S. grabbed at the wheel of the car while Mrs. S. was driving.  (Id. at 129.)  Eventually, M.S. was taken home to change, and she went back to school for the remainder of the day.  (Id.)

Another incident cited by M.S.'s parents occurred later in the school year.  M.S. was left home alone while her parents attended a hockey game.  (Id. at 130.)  When they returned, they noticed that M.S. wasn't home, and a number of mailboxes in the neighborhood were knocked down.  (Id.)  The next morning, they noticed that there were beer cans outside their house, and the key to their front door was missing.  (Id. at 131-32.)  M.S.'s parents called the police, who then questioned M.S.  (Id.)  The police learned that there was a party held at Dr. and Mrs. S.'s house, and that alcohol and cocaine was being used by some of the attendees at the party.  (Id.)  M.S.'s parents subsequently filed criminal charges against their daughter for having a party in their absence.  (Id.)

M.S.'s parents also note that during this year, M.S. would go into "rages."  (Id. at 133.)  These incidents would involve M.S. screaming and using vulgar language towards her parents when she wasn't allowed to get her way.  (Id. at 133-34.)  In January 2002, M.S.'s parents had her re-evaluated by her psychiatrist from Princeton House, who added Vipraxor to her prescription medications to treat these "rages" directed at her parents.  (Id. at 134-35.)

Similar to her conduct the previous year at WWPNHS, M.S.'s parents noted that their daughter had lateness and attendance problems while attending NDHS.  (Id. at 135.)  During her tenth grade year at NDHS, M.S. missed twenty school days (A.R. at 167) which, pursuant to the

10

school's policy, M.S. had to make up by attending Saturday morning detentions.  (Tr. 9 at 135-36.)  M.S.'s parents also note that she was frequently being 'hit on' by boys at the school, and reported one incident of M.S. getting into an altercation with another student who was teasing her.  (Id. at 136.)  The incident, however, was not serious enough to result in disciplinary action for either student.  (Tr. 3 at 118.)  Despite these issues, M.S. successfully completed the tenth grade at NDHS, with an overall grade point average of 83.6/100.[5]  (A.R. at 137.)

During the summer of 2002, following M.S.'s completion of the tenth grade, M.S. began working part time in a local video store, and performing volunteer work at a volunteer-run fair-trade craft store.  (Tr. 9 at 142.)  In July of 2002, M.S. was evaluated by Doctor Lewerenz (Tr.11 at 112), a psychiatrist who had been managing M.S.' medications since August 2001 (Tr. 5 at 42, 72).  From this meeting, Dr. Lewerenz noted that M.S. was enjoying her summer and, while she was still experiencing "ups and downs," her sleep habits and energy level were both better.  (Id. at 79.)  At the end of that month, M.S. was evaluated by an independent study team from NDHS. (A.R. at 127-136.)  This evaluation was requested by M.S.'s parents, who reported that they were "pleased with [M.S.'s] current school placement [(at NDHS)] and are seeking additional supports for their daughter."  (Tr. 3 at 75.)  In their report dated July 29, 2002, this team diagnosed M.S. as emotionally disturbed, and recommended that she remain in her regular education program at NDHS full time, receiving supplementary education of up to ninety minutes a week due to her classification as emotionally disturbed.  (A.R. at 130.)

_____

[5] At NDHS, M.S.'s grades ranged from a 92 in Sports Medicine, to a low of 72 in Honors Algebra/Trigonometry.  (A.R. at 137.)

In August 2002, upon returning from their lake house, Dr. S. discovered a half a gallon of vodka in his daughter's luggage.  (Tr. 9 at 143.)  While M.S. admitted to drinking again, she claimed not to do so in excess.  (Id. at 144.)  Later that month, Dr. S. noticed that his daughter had snuck out of their house.  (Id.)  After waiting up for M.S. to return, she finally arrived home early the following morning.  (Id.)  In punishment for this behavior, M.S.'s parents took away her portable phone and told her that they would no longer drive her to work.  (Id. at 145.)  Upon learning this, M.S. began to scream at her parents, demanding her phone back.  (A.R. at 138.)  When they refused, M.S. continued to confront them.  (Id.)  Dr. S. pushed his daughter aside to leave the room, and she hit him in the arm, as well as pushed Mrs. S. away in an effort to get her phone back from Dr. S.[6]  (Id.)  Following this incident, M.S.'s parents called the police, who responded by coming to the house.  (Id.)  The police arrived at the house to find M.S. crying in her room. (Id.)  The police were able to calm M.S. down and advised her that if they had to return, she would face charges.  (Id.)  After the police left, however, Mrs. S. testified that "it started all over again because [M.S.] wanted her phone and we weren't giving it to her."  (Tr. 9 at 145.)  M.S.'s parents called the police again.  (Id. at 146.)  When they returned, M.S. refused to come with them, insisting that "I haven't done anything, I haven't done anything."  (Id.) When she refused to accompany the police, she was handcuffed and taken into custody.  (Id. and A.R. at 138.)

Following this incident, M.S.'s parents had their daughter charged with simple assault

---

[6] M.S. contends that she struck her father in response to his hitting her first.  (A.R. at 138.)  This version of events is contested in Mrs. S.'s testimony, who stated that while "she [(M.S.)] swears he [(Dr. S.)] hit her . . . he didn't, he didn't even touch her."  (Tr. 9 at 145.)

and she was also charged with resisting arrest.  (A.R. at 140.)  That same day, after M.S. was

taken by the police, Dr. S. called Dr. Lewerenz. (Tr. 5 at 107.)  At Dr. S.'s request, Dr. Lewerenz

wrote a letter to the judge who was handling M.S.'s case urging that M.S. "not be released back

into the community under any circumstances" and advising that she "receive a thorough

psychiatric evaluation for inpatient hospitalization or continued confinement." (A.R. at 152, Tr.

11 at 118.)  M.S. spent the next thirty days in Middlesex County Detention Center ("MCDC").

(A.R. at 41.)  While incarcerated, M.S. underwent a clinical screening by Children's Crisis

Intervention Services at the University of Medicine and Dentistry of New Jersey ("UMDNJ") at

the request of the court.  (A.R. at 216-228.)  The screening report, produced on August 26, 2002,

did not consider M.S. a candidate for hospitalization, but recommended regular therapy be

administered to her three times a week while she remained incarcerated at the detention center.

(Id. at 228.)

On August 23, 2002,[7] M.S.'s parents visited the Family Foundation School in Hancock

New York.  (Tr. 11 at 120.)  The Family Foundation School is a highly regimented school which

---

[7] There is some debate on the record regarding the exact date(s) that the S.'s visited the
Family Foundation School to evaluate placing their daughter there.  Dr. S. testified that he was
"not sure" of the exact dates he visited the school.  (Tr. 11 at 120.)  While he "thought we went
to Family Foundation in September," he also conceded that "it could have been" on August 23-
26, where an unidentified trip was indicated on his personal calendar.  (Id.)  The fact that an out-
of-town trip was actually taken during these dates was corroborated by Dr. Lewerenz's notes
indicating that, while Dr. S. contacted her by telephone on 8/22/02, needing to "talk ASAP," he
would be "out-of-town 8/23 - 8/26."  (A.R. at 206.)  The August dates for the Family Foundation
visit are also supported by the testimony of Susan DiDonato.  She notes that, when she first
spoke with Dr. S. on September 5, 2002, he mentioned that he was looking at having his
daughter placed at a school that he had visited "the week before" called the Family Foundation
School.  (Tr. 12 at 12.)  This would correspond with and corroborate the August 23-26, 2002
dates marked off on Dr. S.'s calendar to establish the dates that M.S.'s parents' visited the
Family Foundation.

"offers a comprehensive program of instruction with a strong emphasis on academics; personal and social living skills; and psychological, moral, and spiritual growth."  (A.R. at 252.)  When a parent chooses to enroll their child at Family Foundation School, an eighteen month minimum stay at the school is required.  (A.R. at 257.)  Once a student's parents decide to enroll their child at the Family Foundation, the school will take extensive measures to effectuate this decision, including placing students in a supervised isolation room for attempting to leave the school, where they may be kept until "they express a sincere intention to cease their offensive behavior." (A.R. at 278.)

The school imposes a strict dress code on students, barring any overly tight or overly loose clothing as well as restricting certain types of messages on clothing.  (A.R. at 269-70.) Students may not bring radios, tapes, books, or other personal items with them to the school. (A.R. at 256.)  While the school is co-educational, students are forbidden from becoming romantically involved with each other.  (A.R. at 267.)  Violation of the school's rules may result in a variety of disciplinary actions, including additional chores, "time-out" (which can last from several hours to several days), required exercise, mandatory smiling, mandatory announcements of their presence and character defect, etc..  (A.R. at 277-79.)

Students at the school live in "family units," comprised of groups of students.  (A.R. 267-68.)  Each member of these units are required to assist in daily chores such as cooking and cleaning of their residence area.  (Id.)  Certain activities, like shopping at the student store on Sundays, may only be done as a group.  (A.R. at 284.)

14

All incoming and outgoing mail must first be read by the student's sponsor (a staff member of the school).  (A.R. 285-86.)  Students may not use the phone at all during their first month at the school, nor are parents allowed to speak with them during this time.  (A.R. at 286.)  After the first month, students may speak to their parents twice a week, but the calls are limited to five minutes and the first call is monitored by a staff member.  (A.R. at 286.)  The school discourages students from ever returning to their prior school.  (A.R. at 257.)  Outside contacts and visits with the student's family are strictly circumscribed by the school, particularly in the first six months.  (A.R. at 284.)

The school itself is not approved by the State of New Jersey for special education placements.  (Pl. Br. at 21 & Def. Resp. Br. at 9.)  The specific qualifications of the staff members of the Family Foundation School, if any, are unclear from the Record.  The only information provided by the school's brochure is that the staff is "diverse in their personal areas of expertise and experience" but they all adhere to the spiritual basis that guides the school and are committed to the school's "12-step" program.  (A.R. at 274-75.)  Additionally, the school notes that most of the staff members "have endured some form of serious personal difficulty in their lives.  . . . [and] [r]eaching out to others in need of similar assistance is a fundamental part of staff members' ongoing recovery."  (Id.)

Following their return from the Family Foundation school, M.S.'s parents met with Dr. Lewerenz on August 28, 2002 to discuss their daughter's situation.  (Tr. 5 at 111.)  At this meeting, Dr. & Mrs. S. suggested that they would like to send their daughter to the Family Foundation School.  (Tr. 11 at 122 and A.R. at 208.)  After this meeting, Dr. Lewerenz wrote a

15

second letter to the family court handling M.S.'s case, also dated August 28, 2002, urging that M.S. remain in "continued confinement" until she could be placed in a "therapeutic and residential school environment where her emotional, behavioral, and academic needs can be appropriately met." (A.R. at 153.) That same day, M.S.'s parents re-enrolled their daughter with the West Windsor Plainsboro School District. (Tr. 11 at 124.)

During her incarceration, M.S. was also evaluated for the family court by Jewish Family and Vocational Service of Middlesex County ("JFVSMC"). (A.R. at 144.) In their report dated September 4, 2002, JFVSMC noted that M.S.'s parents "conveyed that they are not equipped to manage [M.S.] any longer and that she desperately needs an intensive residential treatment facility placement." (Id.) The report also notes that, according to M.S.'s parents, "despite [M.S.'s] emotional and behavioral problems she has always done well in school, including honors classes in math and English during her freshman and sophomore years in high school." Based, in part, upon Dr. S.'s "view that he considers [M.S.] to be a threat to herself and others," the report recommended that M.S. be placed in a therapeutic residential treatment facility. (A.R. at 140.)

_____ On September 5, 2002, Dr. S. spoke to Susan Didonato, district supervisor of special services for the District. (Tr. 12 at 10-11.) During this conversation, Dr. S. indicated that, after visiting the Family Foundation School the week before, he was looking for the District to fund his daughter's placement in that school. (Tr. 12 at 13.) On September 9, 2002, Dr. S. requested that the court handling M.S.'s case make attendance at the Family Foundation School a condition of M.S.'s probation. (Tr. 11 at 127-28 and A.R. at 141.) Subsequently, the court issued an order

16

that included attendance at the Family Foundation School as a specific condition of M.S.'s probation and directed the Sheriff's Department to transport her to the school when space becomes available. (A.R. at 141.)

Later that day, M.S.'s parents had their first unofficial meeting with the District, where they informed the District that they wished to have M.S. placed at the Family Foundation School. (Tr. 3 at 57.) After review of the appropriate documents, a formal IEP meeting was held on September 27, 2002. (Tr. 3 at 69.) In attendance at this meeting were the District's Assistant Director of Special Services, social worker, learning consultant, school guidance counselor, school psychiatrist, and a former teacher of M.S.'s from WWPNHS. (Id. at 69-70.) Also present were Dr. and Mrs. S. as well as lawyers representing both the District and M.S.'s parents. (Id. at 69-70.) The members of the District's child study team talked to Dr. and Mrs. S. about the continuum of services available to help children like their daughter in the public school system, ranging from in-district placements with therapeutic elements to out-of-district residential placements. (Id. at 22.) The child study team noted that any type of decision would be premature since at this point since a thorough review of M.S.'s records would have to be completed to determine what would be the most appropriate placement. (Id.) Dr. S. informed the District's team, however, that he was only interested in a residential placement option for his daughter. (Id. at 22-23.)

After the relevant records were gathered and studied by the District team, an IEP meeting was scheduled and held on September 27, 2002. (Id. at 24.) Following a review of the alternatives available to M.S., the child study team recommended that M.S. be placed in an out-

17

of-district therapeutic day placement at the District's expense.  (<u>Id.</u> at 24.)  The team did not limit

its recommendation to any specific placement, but rather presented three choices that they felt

would be appropriate to M.S.'s situation and stated that they would remain open to examine

additional day placement options as appropriate.  (<u>Id.</u> at 25.)  Dr. S. restated his position at this

meeting that he was only interested in a residential placement for his daughter.  (<u>Id.</u>)  To support

his position, he suggested that the child study team meet with his daughter at the MCDC.  (<u>Id.</u>)

He also said that M.S. had been "acting out" while at the MCDC, and that the child study team

should consult with Ms. Massa, the social worker who had been working with M.S. while at the

detention center about their daughter's behavior there.  (<u>Id.</u>)  He further requested that the team

speak to Dr. Lewerenz, and review the psychological screenings done by UMDNJ and JFVSMC.

(<u>Id.</u>)  The study team, in turn, requested that Dr. S. sign a release for M.S.'s records, and that he

and Mrs. S. visit the three day placements that had been recommended in the District's IEP.  (<u>Id.</u>

at 26.)

After the meeting, the child study team followed up with Ms. Massa regarding M.S.'s

behavior at the MCDC.  (<u>Id.</u> at 27.)  Ms. Massa noted that M.S.'s good behavior had earned her

'honor status' at the detention center.  (<u>Id.</u>)  She also stated that she was unaware of any

significant "acting out" as reported by Dr. S while M.S. was incarcerated at the MCDC.  (<u>Id.</u>)

Two members of the child study team also met with M.S. at the MCDC in early October

2002.  (Tr. 3 at 116.)  During this meeting, they discussed M.S.'s year at NDHS, her home life,

her insight into her past and recent problems, and her goals for the future.  (Tr. 3 at 117-24.)

When questioned about her recent arrest, M.S. noted that "my father knew that he had to have me

arrested if he was going to get me sent away." (Id. at 120.) When asked about her anger management issues, M.S. noted that she didn't feel she had an anger management problem in regards to her schooling. (Id. at 121.) M.S. felt that she only really lashed out at persons she was close to, like her parents. (Id.) While she didn't feel comfortable returning to WWPNHS, due to the embarrassment associated with some of her past behavior there, M.S. did feel that she was socially able to be back in school and could handle a regular high school curriculum. (Id. at 121-22.)

Members of the child study team also conferred with Dr. Lewerenz via conference call regarding M.S.'s condition and Dr. Lewerenz's recommendation for a residential placement. (Id. at 132.) During this call Dr. Lewerenz noted that M.S. was a calm, "good kid," who sometimes had difficulties controlling her emotions. (Id. at 135.) When questioned about the basis for her recommendation that M.S. required residential placement, Dr. Lewerenz said that M.S. suffered from a bipolar disorder that "tends to be a slow building progressive type disorder and that the behavior might build over the next couple years." (Id.) Ms. Gosselin, the WWPNHS school psychologist who participated on the call, characterized Dr. Lewerenz's concerns mandating residential placement for M.S. as long-term, depending heavily on the progression of M.S.'s bipolar condition, which "can be a one-time episode and never re-occur again, or it could be the type of illness that re-occurs and gets progressively worse." (Id.)

Following these meetings, the District's team made revisions to M.S.'s IEP to incorporate the information that had been gathered since the initial meeting with M.S.'s parents, and scheduled a follow up meeting with Dr. and Mrs. S. for October 8th. (Id. at 136-37.) For their

part, M.S.'s parents refused to visit any of the placements that the District's team recommended for their daughter, and also refused to sign the required releases that would allow M.S.'s records to be sent to these placements for a more thorough placement evaluation.  (Tr. 12 at 26.)

On October 8, 2002, the District's IEP team met again with Dr. and Mrs. S.  (Id. at 28.) The team presented its now-revised IEP and re-iterated its position that, even considering the newly acquired information regarding M.S.'s condition, they still believed that a therapeutic day placement was the most appropriate placement for M.S.  (Id.)  M.S.'s parents rejected these recommendations and enrolled their daughter at the Family Foundation School, where she began the eleventh grade on October 15, 2002.  (Tr. 3 at 5.)  M.S.'s parents filed for due process seeking reimbursement for tuition and residential costs incurred for the 2002-03 school year. (Complaint at ¶ 15.)  M.S.'s parents prevailed in this action in an opinion by the ALJ dated May 28, 2004.  On July 22, 2004, the District filed the current action, seeking independent review and reversal of the ALJ's decision.

## II. STANDARD OF REVIEW

The motions before the Court are cross-motions for summary judgment, although they are essentially appeals of the ALJ's decision.  In considering whether to affirm administrative findings, this Court must first determine the proper weight to accord the ALJ's decision. "[J]udicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review."  Susan N., 70 F.3d at 757 (citation omitted).  In Board of

20

Education v. Rowley, the Supreme Court announced a distinctive standard of review which

federal courts must apply when reviewing an ALJ's decisions under IDEA:

> [T]he provision that a reviewing court base its decision on the
> "preponderance of the evidence" is by no means an invitation to the courts to
> substitute their own notions of sounds educational policy for those school
> authorities which they review.  The very importance with which Congress has
> attached to compliance with certain procedures in the preparation of an IEP
> would be frustrated if a court were permitted simply to set state decisions at
> nought.  The fact that § 1415(e) requires that the reviewing court "receive the
> records of the [state] administrative proceedings" carries with it the implied
> requirement that due weight shall be given to these proceedings.

Rowley, 458 U.S. at 206.   In short, the purpose of the "due weight" standard is to "prevent the

court from imposing its own view of preferable educational methods on the states."  Id.

Nonetheless, the deference afforded an ALJ's decision is qualified.  The Third Circuit

"has interpreted the Supreme Court's instruction in Rowley to require that a court consider –

although not necessarily to accept – the administrative fact findings," D.R. v. East Brunswick Bd.

of Educ., 109 F.3d 896, 898 (3d Cir. 1996), "[b]ut if the district court chooses to depart from the

agency's ruling, it should provide some explanation for its departure."  Carlisle Area Sch., 62

F.3d at 527.

Recently, the Third Circuit further defined the meaning of "due weight" and ruled that the

proper standard of review of administrative decisions in IDEA cases is "modified *de novo.*" S.H.,

336 F.3d at 270.  As such, "a district court is required to make findings of fact based on a

preponderance of the evidence contained in the complete record, while giving some deference to

the fact findings of the administrative proceedings.'  Id. (quoting Knable v. Bexley City Sch.

21

Dist., 238 F.3d 755, 764 (6th Cir. 2001).

## III. DISCUSSION

Plaintiff maintains that M.S.'s placement at one of the recommended out-of-district day placement programs would have provided her with a FAPE, and one that was consistent with the IEP.  Defendant asserts that the placement programs proposed by the District would not have conferred meaningful educational benefit to M.S. and seeks confirmation of the ALJ's award of reimbursement for tuition and room and board costs associated with M.S.'s unilateral enrollment at the Family Foundation School as well as attorney's fees and costs of pursuing their action against the District.

This Court, after conducting a thorough review of the record before it and applying appropriate qualified deference due to the ALJ's decision, finds that the Record reveals, by a preponderance of the evidence, that the District's IEP and its proposed placements met the statutory requirements under IDEA.  As such, the Court overturns the ALJ's decision and grants summary judgment in favor of Plaintiff.

### A.      Administrative Hearings and the ALJ's Decision

Hearings on this matter were held before ALJ Steven Reback on various dates between October 2003 and May 2004.  The ALJ heard testimony from a variety of witnesses, including M.S.'s mother and father and three experts who testified on behalf of M.S.'s parents: Dr. Johanna Huntowski, Ed.D., Dr. Richard Levine, PhD, and Dr. Julie Lewerenz, MD.  On behalf of the

District, numerous members of the District's child study team testified, including Mary Jane Gosselin, school psychiatrist at WWPNHS, Cathy Stewart, Supervisor of Secondary Special Services with the District, and Susan Didonato, the District's supervisor of special services.

On May 28, 2004, the ALJ issued a forty four page written decision, ruling in favor of the parents and ordering the District to reimburse M.S.'s parents for the cost of the Family Foundation School placement for the 2002-03 and 2003-04 school years as well as reasonable attorney's fees incurred in bringing their action.[8]  (A.R. at 31 - 74.)  The ALJ's praise for M.S.'s parents and their experts was unequivocal.  The ALJ found the experts presented by M.S.'s parents to be "extraordinary, impressive, knowledgeable, utterly truthful and utterly persuasive." (Id. at 44.)  He characterized each of their opinions as being "based upon intensive, one-on-one evaluation[s] of [M.S.]."  (A.R. at 59.)  The ALJ considered the District's experts, by contrast, to be "well-intentioned people who made a legitimate effort to do what they perceived was best for the child" but presented flawed opinions because "the limitations of time and their lack of any real intimacy with this child" prevented them from getting beyond "a mere profile" of M.S. that "did not accurately reflect or portray the full face of [M.S.]."  (Id. at 59.)  Consequently, the ALJ believed that the District's IEP failed to properly "capture the depth of [M.S.'s] problems, the palpability of her volatility, the rage and anger that defined her or all of the other symptoms" which mandated a residential placement.  (Id.)  By failing to recommend such a placement in their IEP, the ALJ held that the District failed to offer M.S. a FAPE and was in violation of IDEA.

_____

[8] The placement costs for the 2003-04 school year were tied to the judgment regarding the 2002-03 school year by prior stipulation of the parties.  See infra note 1.

C.      **Relative Credibility Determinations of the ALJ**

In reaching his opinion that a residential placement was necessary for M.S. to receive a

FAPE, the ALJ made numerous determinations regarding the facts of this case and the relative

credibility of the experts being presented by both sides.  As a matter of general principle, the

Court will ordinarily defer to the ALJ's factual findings based on credibility judgments in matters

where the Court is asked to sit in appeal of a decision.  See FED. R. CIV. P. 52(a) ("Findings of

fact, whether based on oral or documentary evidence, shall not be set aside unless clearly

erroneous, and due regard shall be given to the opportunity of the trial court to judge the

credibility of witnesses.").  This deference, however, does not render the Court's review of

credibility-based factual findings meaningless.  "Where . . . the[se] findings . . . are not supported

by the record, and indeed, the record supports contrary findings, we must reverse."  Ali v.

Gibson, 631 F.2d 1126, 1129 (3d Cir. 1980), cert. den., 449 U.S. 1129 (1981).

All of the experts presented by both sides of this case to offer testimony before the ALJ

were unquestionably qualified in their respective fields of expertise.  This issue was not contested

by the ALJ in their opinion, and this Court finds no basis in the Record to question the respective

qualifications of these experts either.  The ALJ, however, found that the experts presented by

M.S.'s parents were "utterly persuasive" and, therefore, any conclusions contrary to the

assertions of these experts, including the conclusions of the District's experts, would be entitled

to little, if any weight.  (A.R. at 44.)  Based on an independent review of the Record, however,

this Court cannot sustain the ALJ's conclusions.

24

1.      **The Record does not support lending additional credibility to the experts presented by M.S.'s parents based on the characterization that the parents' decision to place M.S. at the Family Foundation School was the result of reliance on the unanimous and unequivocal opinion of their testifying experts.**

One justification offered for the ALJ's exclusive reliance on the testimony of M.S.'s parents and their experts in assessing M.S.'s needs was that their activities were characterized as an effort to seek "the truth and the best approach to deal with [M.S.]."  (Id.)  The ALJ noted that M.S.'s parents would have been "willing to rely upon the[ir] experts' advise [sic] regardless of the outcome."  (Id.)  The parents' decision to send M.S. to the Family Foundation School was described by the ALJ as a decision not "made exclusively upon the parents' intelligence, observations and expertise" (A.R. at 43.), but rather as a reluctant decision arrived at only after seeking out and consulting experts in this field, who testified at the hearing, and acting only on their unanimous "emphatic and impassioned view" that a residential placement was "absolutely essential" for M.S.  (A.R. at 59.)

This characterization, if supported by the facts on the Record, would certainly support the ALJ giving additional weight to the credibility of the parents' experts and their testimony.  This Court, however, is unable to discern that the facts and relevant timeline of events support such a characterization.   Dr. Lewerenz's notes made of the August 22, 2002 conversation with Dr. S. indicate that Dr. S. had already decided to pull M.S. out of NDHS and that he had retained a special education lawyer to help seek an "outside placement" for his daughter.  (A.R. at 206.)  Dr. Lewerenz's notes of her August 26, 2002 conversation with Dr. S. further indicate that he

25

needed her assistance in finding a "placement [and] profile of type of residential needed/criteria to use to select residential." (Id.)

By the time Dr. and Mrs. S. actually met with Dr. Lewerenz to consult with her about their daughter's situation, the testimony of Dr. and Mrs. S. strongly suggest that their decision to send M.S. to the Family Foundation School was already a *fait accompli*. Dr. S. claimed that when they met with Dr. Lewerenz, he and his wife were keeping an "open mind" with regards to their daughter. (Tr. 11 at 123.) He clarified this, however, by explaining that they both "felt strongly . . . that [M.S.] needed treatment that would probably be a residential placement," at this point but they "would definitely have considered" the opinion of any expert who "came forward to convince [them] that this [(Family Foundation School)] was not an appropriate placement." (Tr. 11 at 123.) Mrs. S. admitted that, before meeting with Dr. Lewerenz, she and her husband were already resigned to the fact that they "could no longer take care of [M.S.] and keep her safe doing what we were doing and that she needed a residential placement." (Tr. 11 at 20.) Dr. S. added in his testimony that, on their drive back from their visit to the Family Foundation School on August 26, 2002,[9] two days before meeting with Dr. Lewerenz, he and his wife "were convinced that this [(Family Foundation School)] was a good place for [M.S], and that this is a place that [M.S] could make a successful transition to." (Tr. 11 at 79.)

The timeline on the Record also demonstrates that other two experts presented by M.S.'s parents were not contacted to consult on whether M.S. should be sent to the Family Foundation

---

[9] See supra note 7 for a discussion of the timing of Dr. and Mrs. S.'s initial visit to the Family Foundation School.

School, but rather to support M.S.'s parents' case against the District to fund M.S.'s placement there. The testimony presented at the due process hearings shows that, by early September, 2002, Dr. and Mrs S. had clearly decided that they wanted to send their daughter to a residential placement,[10] and that they had specifically chosen the Family Foundation School for that placement. Susan DiDonato, the District's Supervisor of Special Services, testified that when she first spoke to Dr. S. on September 5, 2002, he informed her that he was seeking a residential placement for his daughter and that he specifically wanted the District to fund M.S.'s placement at the Family Foundation School. (Id. at 12-13.) Three days later, on September 9, 2002, Dr. S. addressed the Juvenile Court hearing M.S.'s case, informing them that he felt that it was in M.S.'s best interests to a residential placement. (Tr. 11 at 128.) While Dr. S. testified that "he can't recall" whether he and his wife had finalized the decision to send M.S. to the Family Foundation School specifically at this time or whether he mentioned that he wanted to place M.S. there to the court, (id.) a review of the Juvenile Court's order, also dated September 9, 2002, indicates that placement at the Family Foundation School was included as a specific condition of M.S.'s probation. (A.R. at 141.)

Drs. Huntowski and Levine were not brought into the case until after the parents' decision to send M.S. to the Family Foundation School had been well established on the Record. Dr. Huntowski was not consulted on this case until September 12, 2002, when Dr. S. sought her assistance with the District in getting his daughter "properly placed" by the District. (Tr. 11 at

---

[10] The evaluation prepared by JFVSMC on September 4, 2002, similarly documents the fact that M.S.'s parents had determined that M.S. "desperately needs an intensive residential treatment facility placement" by this date. (A.R. at 145.)

141 & A.R. at 183.)  Dr. Levine was brought into the case by M.S.'s parents at the recommendation of their attorneys some time at the end of September, early October 2002, for the express purpose of serving as an expert to support their case to have M.S. placed at the Family Foundation School.  (Tr. 9 at 13-14.)  Neither of these experts were consulted or even contacted before the Record indicates an unequivocal decision by M.S.'s parents to place their daughter at the Family Foundation School.

2.    **An assessment that the experts presented by M.S.'s parents made a better informed, and therefore, more credible evaluation of M.S.'s needs in their stated conclusions is not supported by the facts and testimony on the Record.**

Another basis for the ALJ's determination that the District's experts were entitled to little, if any weight, in their conclusions of M.S.'s educational needs, while the experts offered by M.S.'s parents were given substantial deference to their recommendations for M.S., appears to be the ALJ's assessment that the experts hired by M.S.'s parents 'knew' M.S. far better than the District's experts did.  Each of the parents' experts, the ALJ concluded, made recommendations "based upon intensive, one-on-one evaluation[s] of [M.S.]." (A.R. at 59.)  The District's team, in contrast, "really didn't know [M.S.] as did Levine, Lewerenz, Huntowski and, of course, her parents."  (A.R. at 61.)

Based on a review of the facts on the Record, this Court is unable to concur with this assessment.  With the exception of Dr. Lewerenz, none of the expert witnesses retained by the parents to testify before the ALJ had treated or even met M.S. prior to the bringing of the case

against the District.  The Record also shows that two of these three hired experts never personally met with M.S. before committing to the position that she absolutely needed to be placed in a residential placement.

The first expert presented by M.S.'s parents was Dr. Huntowski.  Dr. Huntowski was a special education expert consulted by M.S.'s parents to provide support for their request to the District for funding a residential placement for their daughter.  (A.R. at 187.)  While the ALJ emphasized that Dr. Huntowski's recommendations were made "only after her observations and interviews" with M.S. and that no promises were made to M.S.'s parents regarding what conclusions she would reach (A.R. at 48-49), the testimony of Dr. S. and the Record before the Court suggests a contrary assessment.  The Record shows that Dr. Huntowski agreed support the position that the District should fund a residential placement for M.S. as early as September 28, 2002.  (Tr. 11 at 142 and A.R. 187.)   This position was reached solely on the basis of her communications with Dr. S., and without the benefit of any first-hand observations or interviews with M.S. to support such an assessment.  This position was reached prior to Dr. Huntowski ever meeting with M.S. or even reviewing any of M.S.'s records.[11]  (Tr. 11 at 142.)

---

[11] Dr. Huntowski's recommendation for M.S. was, by her own testimony, largely, if not exclusively, based on information provided to her by Dr. S.  (Tr. 6 at 100.)  According to Dr. Huntowski, Dr. S. told her that, among his daughter's many problems, she had been "having difficulties in school with verbal outbursts."  (Id. at 95.)  While not noted by the ALJ in his assessment of Dr. Huntowski's recommendation, this Court notes that there is no information in the Record to support such a statement that M.S. was having difficulties in school with verbal outbursts.  No outbursts, or other disciplinary problems, were recorded in M.S.'s records from WWPNHS or NDHS, nor was there any indication of any outbursts in school by any of the experts who assessed M.S.'s condition as part of the two IEP's that were prepared on M.S.'s behalf.  Unquestioned reliance on erroneous information that M.S.'s emotional problems were manifesting themselves in a scholastic environment further justifies additional inquiry into the overall reliability of Dr. Huntowski's assessment as a special education expert as to whether a

The parents' second expert, Dr. Levine, was also not a treating professional who admitted to spending "very little time" with M.S. in making his assessment.  (A.R. 55.)  His expert opinion was specifically sought out by M.S.'s parents, at the recommendation of their attorneys, as part of their preparation for the hearings to challenge the District's IEP.  (Ar. at 51 and Tr. 9 at 11-12.)  His assessment was based on a single meeting with M.S. in the MCDC, and a partial review of her relevant records.  (A.R. at 241.)

The final expert presented by M.S's parents was Dr. Lewerenz. Unlike the other two experts presented by M.S.'s parents, Dr. Lewerenz had seen M.S. prior to the bringing of this case against the District.  Dr. Lewerenz initially met with M.S. in August 2001 to provide 'consults' for adjusting M.S.'s medications as needed.  (Tr. 10 at 16, 21.)  In May 2002, Dr. Lewerenz saw M.S. again, to begin a therapeutic relationship with M.S.  (Id. at 24.)  Dr. Lewerenz saw M.S. two more times prior to July 3, 2002.  (A.R. at 203-04.)  On July 3, 2002, when Dr. Lewerenz met with M.S., she noted that M.S. was doing better and making "good progress."  (Tr. 10 at 33.)  Dr. Lewerenz recommended a modification in M.S.'s current medications, but saw no need for any other changes in M.S.'s current treatment regimen.  (Id. at 33-34.)

On August 22, 2002, however, Dr. Lewerenz received a call from Dr. S.  (Id. at 39.)  Based on this phone call, Dr. Lewerenz wrote a letter to the court on behalf of M.S.'s parents.  (Id. at 39-41.)  This letter recommended that M.S. be incarcerated for an indefinite period of time and "not be released back into the community under any circumstances."  (A.R. 152.)  Like Dr.

residential placement was truly necessary for M.S.

30

Huntowski's assessment of M.S., Dr. Lewerenz's dramatic reversal of Dr. Lewerenz's assessment of M.S. was done without the benefit of meeting with M.S. to conduct any interviews or make any personal observations of M.S.'s mental state before reassessing her prior evaluation, but relied solely on the basis of discussions with Dr. S.  (Tr. 10 at 40-42.)

As noted, the Court is unable to discern support from the facts on the Record for the ALJ's assessment that the expert opinions offered by the witnesses presented by M.S.'s parents were the result of a "full faced picture of [M.S.]" that had eluded the District's experts in their evaluations of M.S.  (A.R. at 72.)  In another part of his opinion, however, the ALJ confusingly suggests that the fact that the experts presented by M.S.'s parents could come to their opinions in such a short time and with limited or no contact with M.S. actually makes their testimony necessitating a residential placement more credible on the grounds that "there are occasions where it doesn't take long to diagnose a child who is severely disturbed." (A.R. 55.)  This statement underscores an inherent inconsistency in the ALJ's relative credibility analysis.  In one part of his opinion the ALJ praises the parents' witnesses for reaching their conclusions quickly and with little or no contact with M.S. (A.R. at 55) while, in another part of his opinion, the ALJ discredits the experts presented by the District on the grounds that their recommendations for M.S. were made using a "cookie cutter approach" (A.R. at 60) without taking the time to "really know her" as her parents and their experts did.  (A.R. at 61 & 66.)

For the reasons noted above, this Court cannot concur in the ALJ's assessment of the strong relative weight applied to the testimony of the experts presented by M.S.'s parents.  This Court similarly cannot find support on the Record to support concurring with the ALJ's relatively

little weight given to the expert testimony presented by the District.  There is no question that the experts put forth by the District were well-qualified and well-intentioned individuals, nor is there any challenge to the methodology used by the District to develop the IEP in offering a proper FAPE for M.S.  (A.R. at 59.)  The sole issue of contention in this case was that the placement recommendation from the District was, in the ALJ's opinion, inappropriate.  (A.R. at 61.)  The ALJ supports his assessment that the District's IEP recommendations were wrong because, despite their good intentions, the District was "ignorant of the fact that [M.S.] may have been raped once or on several occasions, . . . [and also] ignorant of the profound and palpable problems that [M.S.] was experiencing with alcoholism, promiscuity, lack of self-esteem, lack of control, acting out, assaulting her parents and rage which her father, as an interim superintendent and a career education person, had never previously experienced or seen in his entire professional life."  (A.R. at 66.)

This justification, however, is contrary to this Court's reading of the facts and testimony presented on the Record.  The Record shows that the District was clearly aware of M.S.'s possible rape(s) and other promiscuous activities.   The District's counselors met with M.S. and her parents in 2001 at the time of the incident at the swimming pool to discuss the matter and to offer their assistance.  (Tr. 3 at 32-35.)  Mrs. S. even testified that she had learned of M.S.'s possible rape from one of the school's counselors who was sought out by M.S. and her friends following this incident.  (T.R. 9 at 116.)  Rather than being "ignorant" of M.S.'s issues with alcohol, the District was both aware and actively involved in helping M.S. and her family deal with M.S.'s substance abuse issues for the previous two years.  The District convened an

emergency child study team back in 2001 when M.S.'s parents first discovered their daughter had

been drinking again.  (Tr. 9 at 116.)  The District recommended that M.S.'s parents send their

daughter to a rehabilitation program, and even directed them to the Caron Foundation.  (Tr. 11 at

63.)  The District also suggested that M.S.'s parents hold an intervention for her, and directly

participated in the intervention that led to M.S. entering the alcohol treatment program at the

Caron Foundation.  (Tr. 11 at 66 & Tr. 9 at 119-20.)  M.S.'s parents even wrote a letter to the

District Superintendent, praising the District team's efforts in this matter as "truly magnificent."

(A.R. at 94.)  As for knowledge of M.S.'s other emotional problems with rage, acting out, etc. the

District was aware of these problems from the copious information reviewed in compiling the

IEP as well as their meetings with M.S's parents and M.S. herself while incarcerated at the

MCDC.  (Tr. 4 at 30.)

Furthermore, the District was not only aware of these issues, but also specifically

addressed them in the IEP that they presented to M.S.'s parents.  The District offered three

recommended placements that were selected, in part, on their ability to accommodate M.S.'s

continued participation in the Twelve Step program, and assist M.S. in addressing her substance

abuse problems. (Tr. 4 at 31.)  An out-of-district, rather than an in-district, placement was

selected in order to help M.S. distance herself from some of the known problems she

encountered at WWPNHS and NDHS.  (Tr. 4 at 28.)  The District's IEP also contains specific

provisions to offer M.S. numerous levels of individual and group counseling, as well as

assistance with her medication management to help with appropriately addressing her

psychological and emotional problems.  (Tr. 4 at 30.)

33

According 'due weight' to the administrative proceedings in considering testimony provided by both parties, the Court finds the credibility-based determinations made by the ALJ to be unsupported by the facts in the Record.  Accordingly, the Court is entitled to exercise plenary review over the ALJ's exclusive reliance on the conclusions presented by the experts retained by M.S.'s parents and credibility determination applied to the District's experts and their conclusions regarding whether the placements recommended in the District's IEP offered M.S. a FAPE.  See Scott P., 62 F.3d at 527.

## C.   The District's Proposed IEP

As part of their case before the ALJ, the District presented the testimony of Ms. Gosselin, a school psychiatrist for WWPSD and case manager for M.S.'s case, to explain the details of the IEP that the District presented to M.S.'s parents on October 8, 2003.  (Tr. 4 at 4.)  The IEP noted that even M.S.'s parents acknowledged that M.S. had been a very good student up and through the ninth grade, and M.S. was currently exceeding grade level as far as her academic knowledge and skills.  (Id. at 21)  Information provided by NDHS indicated that M.S. had been a cooperative and responsible student, and had not exhibited any behavior that was disruptive in the classroom.  (Id. at 22.)  The District team also considered the IEP prepared in July by the independent team working for NDHS that recommended M.S. return to NDHS with supplemental instruction provided three times a week.  (Id. at 24.)  The team also considered the August 2002 incident, the reports of UMDNJ, JFVSMC.  (Id.)  Team members also personally met with M.S. at the MCDC as well as consulted with the experts retained by M.S.'s parents. (A.R. at 160.)

34

The IEP suggested behavioral intervention to address M.S.'s emotional and substance abuse issues, recommending that M.S. undergo group, individual, and substance abuse counseling on a weekly basis - regardless of where she was placed educationally.[12]  (Tr. 4 at 5; A.R. at 167 & 171.)  To address M.S.'s educational needs, the District team considered the full continuum of services available.  (Tr. 4 at 27.)  Placement back in a large high school, as recommended in the July 2002 IEP, was deemed not restrictive enough to address M.S.'s needs.  (Id. at 27.)  While M.S. could still receive counseling at such a placement, M.S. had expressed reservations during her interview with the District team members about returning to her former school, based on her fear of being judged by her former peers for past behaviors.  (Id. at 28.)  The District team also felt that, given M.S.'s past problems with drugs and alcohol, encouraging her to develop new peer groups would be highly beneficial - contributing to a desire to place her in an educational setting outside the District.  (Id. at 29.)

The District team then evaluated the next level of available placements - private, out-of-district day placements.  Three out-of-district private schools were recommended in the IEP as options for M.S.: University Behavioral Health Care Adolescent Day Program, East Mountain School, or the Collier School.  All three of these were state-approved private schools for serving children who had been classified as emotionally disturbed, and each was located within 45 minutes of M.S.'s home.  (Complaint at ¶ 14.)  Any of these would allow M.S. to have a "fresh start" with a new peer group, as well as allow her to learn in a smaller setting than a public high

---

[12] Two of the schools proposed in the District's IEP had licensed substance abuse counselors on staff, and the third would work closely with M.S. and her A.A. program.  (Tr. 4 at 15.)

school could accommodate.  (Tr. 4 at 30.)  Each of these schools could provide counseling to

M.S., both on an individual basis and in a group setting,[13] as well as offer additional supervision

that the District team felt was important.  (Id.)  The schools also provided support options for

M.S.'s medication program.  (Id. at 31.)  Two of the recommended schools were also connected

to hospital-based programs that could not only support M.S.'s use of medications, but could also

help to regularly monitor and manage them for her.  (Id.)  Additionally, all of the programs

recommended by the District supported the Twelve Step program which M.S. was on for her

alcohol abuse issues.  (Id.)  Professional student assistance counselors were also available to

provide regular substance abuse counseling for M.S.[14]  (Id. at 132-34.)  These counselors were all

"certified," either as licensed clinical social workers, clinical psychologists, or Ph.D.

psychologists.  (Id. at 134-35.)

Residential programs, as requested by M.S.'s parents, were also considered, but the

District team felt that these would be too restrictive for M.S.  (Id. at 32.)  M.S. had never been

given any opportunity to benefit from less restrictive services, and the District team sought to

offer a program that would allow more mainstreaming for M.S. in the future to possibly

transition her back into a public school setting.  (Id.)  The team also felt that a residential

---

[13] The counseling programs offered at all three schools was based on a "less
psychoanalytically oriented type approach and more of a cognitive behavioral approach"
consistent with the counseling recommendations Dr. Lewerenz provided to the IEP team.  (Tr. 4
at 31-32.)

[14] These counselors were available on-site at two of the three placements offered in the
IEP (Collier and East Mountain School).  (Tr. 4 at 132-33.)  If M.S. and her parents had opted for
the third placement, UMDNJ, the District would have either contracted for outside counseling or
the arranged for the student assistance counselor from WWPNHS to meet with M.S. and provide
counseling on regular intervals.  (Id. at 133.)

program would be inconsistent with one of M.S.'s stated goals of developing skills to handle her own freedom sufficient for her to attend college.  (Id. at 33.)  By placing her in such a restrictive environment, the team felt that M.S. would not be given the opportunity to properly develop these skills.  (Id.)  The team concluded that a day placement, by comparison, offered M.S. the opportunity to develop her skills to make "wiser choices," gradually and with supervision and support, to help her to better function in the community at large.  (Id.)

Aside from noting some minor criticisms of the District's proposed IEP raised by Drs. Levine and Huntowski, the ALJ concluded that the proposed IEP "seems reasonable, fair, and well documented."  (A.R. at 65.)  The only shortcoming recognized by the ALJ was that the IEP failed to require a residential placement for M.S.  (A.R. at 65.)  The ALJ reasoned that such a recommendation was required since "nothing short of a residential therapeutic educational placement would provide [M.S.] with the possibility of survival . . . much less a FAPE."  (A.R. at 59.)  For the reasons set forth below, however, this Court finds, by a preponderance of the evidence, that the District's IEP offered M.S. a FAPE and met with the requirements of IDEA.

**D.     The ALJ's Analysis of a Free and Appropriate Education for M.S.**

Under IDEA, the District was not required to maximize M.S.'s potential, provide the best possible education, or place M.S. at the school her parents liked best.  Rather, the statutory obligation of IDEA requires the District to offer "personalized instruction with sufficient support services to permit [M.S.] to benefit educationally from that instruction."  Rowley, 458 U.S. at 203.  The developed IEP must have provided "meaningful" access to education, id. at 192, and

conferred "some educational benefit" upon M.S.. Id. at 200. M.S.'s parents and the ALJ's decision are not contesting the IEP itself. They are, instead, challenging the school placement options offered in the IEP as inadequate to offer M.S. a FAPE.

The legal analysis and conclusions of the ALJ's opinion are presented in a section entitled "The Facts" where the ALJ concludes that while he is not "certain that [M.S.] could not have received an [sic.] FAPE with some meaningful benefit at the placement offered by West Windsor . . . it was not worth the risk to place [M.S.] in a day program." (A.R. at 36.) Supported by the testimony of the experts presented by M.S.'s parents, the ALJ held that "the threat that [M.S.] posed to herself and others, including the possibility of dying in the streets or becoming a junkie or any other nightmare your imagination can conjure up, were far too great to risk [placement in a day program]." (A.R. at 36.)

This Court finds this type of analysis inapplicable to the established legal standards for evaluating IDEA cases. In conducting an analysis for whether a full-time placement is necessary a court must make an inquiry as to whether the residential placement is "a response to medical, social, or emotional problems that are segregable from the learning process." Kruelle v. New Castle County School District, 642 F.2d 687, 693 (3d Cir. 1981). This requires an evaluation of whether the residential placement is "required for emotional problems and [i]s therefore the responsibility of the parents or social service agencies or whether full-time placement [i]s a necessary ingredient for learning." Id. The ALJ attempts to collapse the distinction on two grounds: (1) by declaring that M.S.'s truant behavior would make her unavailable to attend the out-of-district day placements suggested by the district, and (2) that the structure of a full-time

residential program is an educational necessity for M.S. due to the "threat that she posed to herself and others."  (A.R. at 35-36.)

These justifications, however, fail to address the relevant issue in this case – namely, whether or not the IEP presented by the District was designed to ensure the implementation of a free and appropriate <u>education</u> for M.S.  <u>See</u> <u>S.H.</u>, 336 F.3d at 264.  The Court certainly sympathizes with M.S.'s parents and their dilemma in finding the ideal environment for their daughter and appreciates their concerns in trying to provide their daughter with what they believed to be the best opportunities available to her.  The sympathetic nature of M.S.'s situation, however, does not change the applicable law.  "Neither the Court nor the school district can be charged with caring for a disabled child at all times.  Federal and State laws merely require that basic <u>educational</u> opportunities be provided through individual programs."  <u>Schreiber v. Ridgewood Bd. of Ed.</u>, 952 F.Supp. 205, 211-12 (D.N.J. 1997) (emphasis added).  "A residential placement that is necessary for medical, social, or emotional problems segregable from the learning process itself . . . need not be funded by the local educational agency."  <u>Bd. of Ed. of Montgomery County</u>, 1998 U.S. App. LEXIS at *46 n25.  The ALJ's assessment resembles a standard more akin to a  psychiatric commitment or hospitalization (danger to self or others) than the appropriate standard of whether the proposed District placement was designed to provide "education 'in the least restrictive environment that will provide [the student] with a meaningful educational benefit.'"  <u>S.H.</u>, 336 F.3d at 265 (quoting <u>T.R.</u>, 205 F.3d at 578).

**1.**	**This Court cannot find support in the Record to sustain the ALJ's conclusion that a residential program was educationally necessary to address M.S.'s school**

attendance issues.

Without making a distinction between general emotional problems and problems that are not segregable from M.S.'s learning process, the ALJ merges them by concluding that M.S.'s emotional problems would make her unavailable to attend the out-of-district day placements suggested by the District and, therefore, M.S. would be unable to derive educational benefit from these, or any other non-residential placements.  (A.R. at 35.)  This assessment was based on the testimony of some of the expert witnesses presented by M.S.'s parents.  These experts concluded that M.S.'s emotional problems either have already or had the potential to so severely impact her school attendance, that a residential program would be the only way that M.S. could derive any meaningful educational benefit.  Dr. Levine, for example, noted that a restrictive residential environment like the Family Foundation was "the only environment where [M.S.] can be adequately educated, where she'll be every day and be available every day."  (Tr. 9 at 71.)  Dr. Lewerenz conceded that the District's proposed placements could provide the requisite educational benefits to M.S., but qualified this concession by noting that these benefits could only be derived "if you could get her there."  (Tr. 10 at 67.)

The conclusion that a residential placement was required to ensure M.S.'s attendance at school, however, is unsupported by the facts on the Record.  The Record indicates that M.S. did, in fact, attend school regularly for the prior two years of high school - even without any of the psychological counseling or other support structures being offered by the District's proposed IEP.  During the ninth grade at WWPNHS, M.S. missed a total of twelve days of school.  (A.R. 194.)  During the tenth grade at NDHS, M.S. missed twenty school days. (A.R. at 167)  While these

40

were not stellar attendance records, they do not support such a dire conclusion that M.S.'s school attendance was so poor that anything short of a full-time residential educational program would fail to offer her a meaningful educational benefit.

In fact, despite her attendance problems at WWPNHS and NDHS, M.S. managed to obtain passing grades in all her classes and maintain a "solid B average" during her first two years of High School.  (A.R. at 167.)  While passing grades are not per se conclusive in determining that M.S. received a proper educational benefit from these two years, such educational progress strongly suggests that M.S. did receive such an educational benefit.  See Rowley, 458 U.S. at 202-03.  There is no support from the facts in the Record to indicate that, absent anything short of a full-time residential program, M.S.'s school attendance over the next two years would be so poor that she could not continue to receive a meaningful educational benefit from any program less restrictive than a full-time residential placement.

Monitoring M.S.'s attendance at school was nonetheless one of the concerns identified in the District's IEP and included among the issues that were to be addressed with M.S.'s placement in one of the District's recommended day programs.  (A.R. at 158, 181.)  The IEP offered monitoring and follow-up on M.S.'s attendance, including regular attendance conferences with M.S. and her parents, following up with calls home if M.S. was late or failed to show up to school, and establishment of behavior contracts with incentives to improve M.S.'s attendance. (Tr. 4 at 13-14.)  There is no evidence offered to contradict the District's position that a day-placement program with the additional supports offered by the District in their IEP, would be sufficient to adequately address M.S.'s attendance issues and ensure that she derived adequate

educational benefit from one of the day programs recommended in the IEP.

Furthermore, M.S.'s documented attendance issues seem to stem from two sources: (1) social anxiety about facing her fellow students; and (2) defiance towards her parents.  The first issue was directly and adequately addressed in the District's IEP.  The District noted that they excluded in-district placements from their recommendations in order to alleviate M.S.'s anxiety about being "judged" on the basis of her prior behaviors while attending WWPNHS and having to face her former peers.[15]  (Tr. 4 at 28 and A.R. at 168.)   The second issue is one that is distinctly segregable from the learning process.  Although M.S.'s parents testified that getting M.S. to go to school was "a struggle" (Tr. 11 at 59), there is no support on the Record for a conclusion that the struggle was so great that it would prohibit M.S. from deriving any significant educational benefit outside a residential setting.  Even if it could be demonstrated that M.S.'s defiance of her parents regarding school attendance would rise to such a level, as the Fourth Circuit aptly noted, "such oppositional and defiant behavior is an emotional problem causally unrelated to the learning process."  Bd. of Ed. of Montgomery County v. Brett Y., 1998 U.S. App. LEXIS 13702, *46 n25 (4th Cir. 1998).  This, therefore, cannot provide the proper basis on

---

[15] WWPNHS has a well-staffed Academy program that would seemingly be properly suited to meet M.S.'s educational and emotional needs.  (Tr. 4 at 28-29.)  This program is staffed with full-time special education teachers, a social worker, learning consultant and counselor. (Id.)  This program, however, was not recommended in the IEP since students in the Academy program remain integrated with other WWPNHS students, which may place additional anxiety on M.S. from seeing her fellow students again.  (Tr. 4 at 29.)  Such a placement may also impede M.S. from developing new peer groups, which was deemed important for a student dealing with drug and alcohol issues.  (Id.)  The District's IEP specifically noted that the recommendation of a private, out-of-district day placement was made with the goal of having "a positive impact on [M.S.'s] attitude toward school and her willingness to attend regularly" by "diminish[ing] her levels of anxiety regarding social interactions during the school day."  (A.R. at 168.)

which to require a residential placement for M.S. under IDEA.

**2.     The other emotional problems relied upon by the ALJ in his a conclusion that M.S. required residential placement are largely segregable from M.S.'s educational needs.**

The ALJ further supports the conclusion that a residential placement was required for M.S. on the grounds that "given the dire straits she was in, she absolutely needed a 24-hour, seven day a week environment where there was supervision, nurturing, a buddy system and where she would learn to be responsible for her own actions." (A.R. at 36.) Rather than evaluate whether M.S. would have received a FAPE with some meaningful benefit at the placements offered by the District, the ALJ held that "it was not worth the risk to place [M.S.] in a day program." (Id.)

The experts presented by M.S.'s parents similarly avoided making any distinctions among M.S.'s social and emotional problems and their impact on M.S.'s learning environment. Dr. Huntowski declined to identify which, if any, of M.S.'s problems were segregable from the learning process by noting that, although "[M.S.'s] acting out occurs after school," a residential educational placement is still necessary to help M.S. learn to "cope with the responsibilities of life and how to cope in general." (Tr. 6 at 38.) Dr. Lewerenz's recommendation for residential placement relied, by her own admission, on behaviors that were almost exclusively outside the educational environment,[16] (Tr. 10 at 67-68) basing her recommendation for an educational

---

[16] Dr. Lewerenz justified residential placement based on M.S. being a threat to herself and others. (Tr. 10 at 48.) Dr. Lewerenz believed that M.S.'s drinking and sexual promiscuity, both

placement on fear that M.S.'s "behaviors at home <u>may</u> at any point generalize to others." (A.R. 232 (emphasis added).)  M.S.'s parents' final expert witness, Dr. Levine, noted that, even though M.S. was "a bright young lady who has such ability that even in this declining state, she's still able to function within the educational environment" (Tr. 8 at 99), residential placement and "24 hour surveillance" were nonetheless required so that M.S. would be "forced to deal with her behaviors rather than acting them out."  (<u>Id.</u> at 88.)

These justifications for residential placement all fail to address the relevant issue under an IDEA analysis.  "[T]he substantive inquiry for residential placement is whether the nature or severity of the handicap is such that education in regular or special classes, with the use of supplementary aids and services, cannot be achieved satisfactorily, under the <u>Rowley</u> standard of some meaningful <u>educational</u> benefit."  <u>D.B v. Ocean Township Bd. of Ed.</u>, 985 F. Supp. 457, 492 (D.N.J. 1997) (emphasis added).   As noted by the ALJ, the expert witnesses hired by M.S.'s family were "unambiguous, emphatic, and impassioned [in their] view that in order to make an effort to save this child, a therapeutic residential placement with palpable supervision and appropriate rehabilitation programs was absolutely essential." (A.R. at 59.)  The ALJ similarly concurred in this conclusion in order to give M.S. "a chance to recapture a normal, healthy,

_____

behaviors which were well outside the learning environment, made her a threat to herself (<u>id.</u> at 75), and relied on M.S.'s documented explosive outbursts directed at her parents, also occurring outside the learning environment, to conclude that M.S. was a threat to others.  (<u>Id.</u> at 73.)  The only behavior Dr. Lewerenz offered that was even tangentially related to M.S.'s learning environment was the incident where M.S. got into a fight with another student who was teasing her while M.S. was attending NDHS.  (<u>Id.</u> at 74.)  Dr. Lewerenz, however, was unable to offer any details of this incident such as the severity of the incident or details on how the incident transpired.  (<u>Id.</u> at 74.)  Other testimony on the Record, however, shows that this incident was not serious enough to result in disciplinary action for either student.  (Tr. 3 at 118.)

productive life." What this analysis fails to do, however, is offer a justification for why such a placement was necessary for educational reasons. As noted by the District, M.S. performed adequately academically when she was at school and has had few, if any, documented disciplinary problems in an academic setting. The justifications offered to invalidate the District's recommendation and require residential placement are focused on behaviors that are largely unrelated to, and easily segregated from, M.S.'s educational needs. This Court is satisfied, by a preponderance of the evidence in the Record, that M.S.'s educational needs were adequately and appropriately addressed by the IEP and the educational placements it proposed. Accordingly, this Court holds that the District has met its burden of showing that its proposed placements did offer M.S. a FAPE as required under the standards of IDEA and that M.S.'s parents, therefore, are not entitled to reimbursement for the unilateral placement of their daughter at the Family Foundation School. See Lascari v. Bd. of Educ., 116 N.J. 30, 36 (1989) Accordingly, the ALJ's decision is overturned.

## IV. CONCLUSION

As required by the standard, this Court has reviewed the voluminous evidence in the record, as well as the ALJ's assessment of the arguments raised by the parties and his findings based on the testimony and written exhibits before him. Having done so, this Court finds, based on a preponderance of the evidence in the record, that the District has met its burden of proof to establish that the IEP placement recommendations made to M.S.'s parents offered M.S. a free and appropriate education. As such, M.S.'s parents are not entitled to be reimbursed for the costs of their unilateral placement of M.S. at the Family Foundation School. Plaintiff's Motion is

hereby **GRANTED**, and Defendant's Motion is hereby **DENIED**.  An appropriate form of order will be filed herewith.


Dated:  October 28, 2005


       /s Stanley R. Chesler       

Stanley R. Chesler, U.S.D.J.